IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CAITLIN W., ET AL.,               :
                                  :          CIVIL ACTION
            v.                    :
                                  :          NO. 03-6051
THE ROSE TREE MEDIA SCHOOL        :
DISTRICT                          :

**SURRICK, J.**                                    **MAY  15 , 2009**

<u>**MEMORANDUM**</u>

Presently before the Court are Plaintiffs Caitlin and Louise W.'s Motion for Disposition

on the Administrative Record (Doc. No. 20), and Defendant Rose Tree Media School District's

Motion for Judgment on the Administrative Record (Doc. No. 23).  For the following reasons,

Defendant's Motion will be granted and Plaintiffs' Motion will be denied.

**I.      BACKGROUND**

Caitlin W. ("Caitlin") is the minor child of Mark W.[1] and Louise W. (collectively

"Plaintiffs").  (Doc. No. 1 ¶¶ 10-12; Doc. No. 20, Ex. A at S-1.)  Plaintiffs reside in the Rose

Tree Media School District ("the District").  (*Id.*)  Plaintiffs seek, *inter alia*, reimbursement of

Caitlin's private school tuition costs from the District under the Individuals with Disabilities Act

("IDEA"), 20 U.S.C. §§ 1400, *et seq.*

For nearly ten years, Caitlin did not attend a public school in the District.  Instead, from

the Fall of 1992 through the Spring of 2001, Caitlin attended a private preparatory school called

the Agnes Irwin School ("Agnes Irwin").  (Doc. No. 20, Ex. C, Findings of Fact ¶ 3.)  In the

Spring of 2001, Caitlin began to experience academic and emotional problems at Agnes Irwin.

---

[1] Mark W. died on January 9, 2007, and was removed from the caption of the case on
April 3, 2007.  (*See* Doc. Nos. 25, 26.)

(Doc. No. 1 ¶ 13.)  The school could not successfully accommodate Caitlin's problems "despite increased academic and emotional support."  (*Id.*)  Consequently, Caitlin withdrew from Agnes Irwin on April 30, 2001, before the end of the ninth grade.  (Doc. No. 20, Ex. C, Findings of Fact ¶ 2.)

On May 4, 2001, Caitlin enrolled in the District.[2]  (*Id.* ¶ 10.)  At the time of her enrollment, Caitlin's parents notified the District that Caitlin was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), the effects of which made it impossible for Caitlin to attend Agnes Irwin.  (*Id.* ¶ 7.)  At the District's request, Caitlin's parents signed a Permission to Evaluate form.  (*Id.* ¶¶ 8-9.)  On July 4, 2001, Caitlin applied to the Academy at Swift River ("ASR"), an "'emotional growth or therapeutic boarding school' located on 650 acres in rural Massachusetts."  (Doc. No. 20, Ex. C, Findings of Fact ¶¶ 49, 77.)  Caitlin began to attend ASR on August 27, 2001, notwithstanding her enrollment in the District.  (*Id.* ¶ 79.)

On July 26, 2001, following Caitlin's evaluation, the District prepared a Comprehensive Evaluation Report.  (Doc. No. 1 ¶ 14.)  The District recommended that Caitlin receive special education services as a student with ADHD and Serious Emotional Disturbance.  (Doc. No. 20, Ex. C, Findings of Fact ¶ 27; Doc. No. 20, Ex. A, at S-7.)  On August 23, 2001, the District gave the Report to Caitlin's parents along with an invitation to participate in the Individualized Education Program ("IEP") team meeting.  (*Id.*, Ex. C, Findings of Fact ¶ 28.)  The meeting was held on August 30, 2001, after Caitlin had already started at ASR.  (*Id.* ¶¶ 29-30, 30 n.7.)  The IEP team proposed a program for Caitlin and developed an IEP that summarized Caitlin's current

---

[2] Although Caitlin was enrolled in the District, she "attended [a private school] and/or [received] homebound instruction until the end of the school year" for reasons that are not explained in the record.  (Doc. No. 20, Ex. C ¶ 10.)

needs and conditions.  (*Id.* ¶ 30.)  The IEP team found that Caitlin needed "improved attention and organizational skills, improved self-management of school related behavior, and improved social skills related to peer relationships."  (*Id.* ¶ 31.)  The IEP proposed a weekly 45-minute session of mental health counseling at school.  (*Id.* ¶ 33.)  The IEP also proposed "extended test-taking time, quiet area for test taking, assignment modifications, academic monitoring through progress sheets three or four times per marking period, clear and precise directions with checking for understanding, preferential seating, redirection and cues for focusing, provision of assignment book and calendar, monitoring assignment completion, [and] monitoring school behavior."  (*Id.* ¶ 34.)  In addition, the IEP proposed "daily check-in support with special education case management to address issues of emotion well-being."  (*Id.* ¶ 37.)  Finally, because Caitlin was new to the District, the IEP recommended that a functional behavioral assessment and behavior plan for Caitlin take place within her first month of school.  (*Id.* ¶ 36.)

Caitlin's parents did not approve of the IEP.  They felt that it addressed Caitlin's ADHD but not her emotional and behavioral needs.  (*Id.* ¶ 41.)  They thought that Caitlin needed "residential placement in a highly structured therapeutic setting; weekly group and individual therapy; small classes (10 students or less); social skills development; individualized tutoring and mentoring; special learning needs support; psychotropic medication management; [and] family therapy."  (*Id.*)  On September 10, 2001, Caitlin's parents rejected the IEP and requested a prehearing conference, mediation, and a due process hearing.  (*Id.* ¶ 81.)  The District did not submit the request to the Pennsylvania Department of Education and did not otherwise respond.  (Doc. No. 1 ¶ 15.)  Caitlin remained enrolled in ASR for the entire year.  (*See* Doc. No. 20, Ex. C, Findings of Fact ¶ 56.)

3

On October 7, 2002, Caitlin's parents enrolled her at a boarding school in Vermont, the

King George School ("KGS").  (Doc. No. 1 ¶ 16; Doc. No. 20, Ex. C, Findings of Fact ¶ 57.)  In

November 2002, they made a second request for a due process hearing with the District.  (Doc.

No. 20, Ex. D at 2.)  This time, the District responded and scheduled a due process hearing.  On

February 3, 2003, the District held the hearing over a three-day period.  (*Id.*, Ex. C.)  The Hearing

Officer, Linda M. Valentini, Psy. D., concluded that the District had offered Caitlin a "free

appropriate public education for the 2001-2002 school year."  (*Id.* at 21.)  The Hearing Officer

concluded that the unilateral private placements obtained by Caitlin's parents were not

appropriate and that the equities in the matter were equally balanced.  (*Id.*)  Caitlin's parents

objected to the Hearing Officer's decision and appealed to the Special Education Appeal Panel.

(Doc. No. 20, Ex. D.)  The Appeals Panel affirmed the Hearing Officer's decision.  (*Id.* at 4.)

On November 3, 2003, Plaintiffs filed this action appealing the decision and seeking,

*inter alia*, tuition reimbursement under IDEA.  (*See generally* Doc. No. 1.)  On April 19, 2004,

Plaintiffs filed a Motion for Limited Judgment on the Pleadings.  (Doc. No. 11.)  We denied the

motion, stating:

> in order to conclude that reimbursement is appropriate in this case, we must
> necessarily determine whether (1) the IEP was inappropriate and (2) the placement
> of Caitlin at ASR or KGS was appropriate. . . .  In this Motion, Plaintiffs do not argue
> that the IEP was inappropriate or that the placement at ASR or KGS was appropriate.
> Rather, Plaintiffs rely solely on the fact that Defendant violated the IDEA through its
> failure to grant Plaintiffs a due process hearing in a timely manner.  This is not
> sufficient.

(Doc. No. 14 at 9-10.)  Plaintiffs filed a motion for reconsideration.  (Doc. No. 15.)  On June 30,

2005, we denied the motion for reconsideration.  (Doc. No. 17.)

Presently before the Court are Plaintiffs' and Defendant's Cross Motions for Judgment on

4

the Administrative Record.  (Doc. Nos. 20, 23.)  Plaintiffs again seek tuition reimbursement on

the basis of the Administrative Record, claiming that the IEP was inappropriate and that Caitlin's

private school placements were appropriate.  The District seeks summary judgment based upon

the Administrative Record.

## II.  LEGAL STANDARDS

### A.  The IDEA

The purpose of the IDEA is "to ensure that all children with disabilities have available to

them a free appropriate public education [("FAPE")]."  20 U.S.C. § 1400(d)(1)(A).  A FAPE is

"an educational instruction 'specially designed . . . to meet the unique needs of a child with a

disability,' coupled with any additional 'related services' that are 'required to assist a child with a

disability to benefit from [that instruction].'"  *Winkelman v. Parma City Sch. Dist.*, 127 S. Ct.

1994, 2000-01 (2007) (*citing* 20 U.S.C. § 1401(29); *id.* § 1401(26)(A)); *id.* § 1401(9)).  A "child

with a disability" includes those who suffer from a "serious emotional disturbance . . . or specific

learning disabilities."  20 U.S.C. § 1401(3)(A).  A FAPE must be provided "under public

supervision and direction, . . . meet the standards of the State educational agency, . . . [and]

include an appropriate preschool, elementary school, or secondary school education in the State

involved."  *Winkelman*, 127 S. Ct. at 2001 (*citing* 20 U.S.C. § 1401(9)).  It must be provided at

"no cost to parents."  *Id.* (*citing* 20 U.S.C. § 1401(29)).  School districts are not required to

provide a FAPE that "maximizes" a child's education.  *See Rowley*, 458 U.S. at 199 (finding that

a FAPE does not require "the furnishing of every special service necessary to maximize each

handicapped child's potential").  Rather, they are obligated "to provide an IEP that is 'reasonably

calculated' to provide an 'appropriate' education as defined in federal and state law."  *T.B. ex rel.*

*N.B. v. Warwick Sch. Comm.*, 361 F.3d 80, 83 (1st Cir. 2004) (*quoting Rowley*, 458 U.S. at 207).

Accordingly, school districts need not devise the best possible IEP, flawlessly implement IEPs,

or provide what the parents might consider to be an ideal education.

   To ensure that every qualifying child receives a FAPE, school districts must develop an

IEP that is tailored to the child.  *Rowley*, 458 U.S. at 181.  School districts must "conduct a full

and individual initial evaluation . . . before the initial provision of special education and related

services to a child with a disability."  20 U.S.C. § 1414(a)(1)(A).  The evaluation should rely

upon "a variety of assessment tools and strategies to gather relevant functional, developmental,

and academic information, including information provided by the parent."  *Id.* § 1414(b)(2)(A).

The evaluation should "not use any single measure or assessment as the sole criterion for

determining whether a child is a child with a disability or determining an appropriate educational

program for the child."  *Id.* § 1414(b)(2)(B).

   The IDEA provides for administrative and judicial review of an IEP.  *See* 20 U.S.C.

§ 1415(a) (2008).  In Pennsylvania, there is a two-tiered system of administrative review.  *See* 22

Pa. Code § 14.162(o) (2004).  Under this system, parents who object to an IEP may request an

impartial due process hearing conducted by a hearing officer.  *Id.* § 14.162(b).  The hearing must

be held within thirty days of the request.  *Id.* § 14.162(q)(1).  A party aggrieved by the hearing

officer's decision may appeal to a Special Education Due Process Appeals Panel.  *Id.*

§ 14.162(o).  An aggrieved party may then appeal that decision by initiating a civil action in

federal district court.  *Id.* § 1415(i)(2)(a).  The court "may award a disabled student the cost of [a]

private placement [in a private school] if (1) the court determines [that] the student's IEP is

inappropriate and (2) the student demonstrates that the private placement he seeks is proper."

*Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 248 (3d Cir. 1999); *see also N.M. ex rel. M.M. v. Sch. Dist. of Phila.*, 585 F. Supp. 2d 657, 669 (E.D. Pa. 2008) (noting same). Reimbursement may be subject to equitable considerations.  *Ridgewood*, 172 F.3d at 248 n.7.

### B.   Disposition on the Administrative Record

When an aggrieved party initiates a civil action in a federal district court, the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(B).  "Judicial review in IDEA cases differs substantively from judicial review in other agency actions, in which the courts are generally confined to the administrative record and are held to a highly deferential standard of review."  *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 757 (3d Cir. 1995).  In IDEA cases, district courts are required to give "due weight" to the factual findings of the state administrative agency.  *Rowley*, 458 U.S. at 206.  The Third Circuit has defined "due weight" as "modified *de novo* review."  *S.H. v. State-Operated School Dist. of City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003).  Under this standard, "a district court is required to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings."  *Id.* (*quoting Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir. 2001)). "Factual findings from the administrative proceedings are to be considered *prima facie* correct. '[I]f a reviewing court fails to adhere to them, it is obliged to explain why.'"  *Id.* (*quoting M.M. v. Sch. Dist. of Greenville County*, 303 F.3d 523, 530-31 (4th Cir. 2002)) (internal citations omitted).

When reviewing an administrative decision in a Pennsylvania IDEA case, a federal court

is "required to defer to the [Hearing Officer's] factual findings unless it can point to contrary nontestimonial extrinsic evidence on the record." *S.H.*, 336 F.3d at 270 (*citing Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 529 (3d Cir. 1995)).  The court "must explain why it does not accept the [Hearing Officer's] findings of fact to avoid the impression that it is substituting its own notions of sound educational policy for those of the agency it reviews."  *Id.* (citations omitted); *see also Travis G. v. New Hope Solebury Sch. Dist.*, 544 F. Supp. 2d 435, 441 (E.D. Pa. 2008) ("The Court is not . . . to substitute its own notions of sound educational policy for those of local school authorities." ) (citations omitted); *L.R. v. Manheim Twp. Sch. Dist.*, 540 F. Supp. 2d 603, 614 (E.D. Pa. 2008) (noting same).  "Only those procedural violations of the IDEA which result in loss of educational opportunity or seriously deprive parents of their participation rights are actionable."  *C.M. v. Bd. of Ed.*, 128 Fed. App'x 876, 881 (3d Cir. 2005) (unpublished opinion); *see also Souderton Area Sch. Dist. v. J.H.*, No. 08-2477, 2009 WL 349733, at *6 (E.D. Pa. Feb. 11, 2009) ("Procedural errors do not violate the right to a FAPE unless they result in 'the loss of educational opportunity, seriously infringe upon the parents' opportunity to participate in the IEP formulation process, or cause a deprivation of educational benefits.") (citations omitted).

### C.   Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists only when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When deciding a motion for

8

summary judgment, the court must view facts and inferences in the light most favorable to the

nonmoving party.  *Id.* at 255; *see also Siegel Transfer, Inc., v. Carrier Express, Inc.*, 54 F.3d

1125, 1127 (3d Cir. 1995).  We do not resolve factual disputes or make credibility

determinations.  *Siegel Transfer*, 54 F.3d at 1127.

## III.   DISCUSSION

Plaintiffs seek reimbursement of Caitlin's private school tuition on the grounds that the

District did not offer her a FAPE.  As a threshold matter, Plaintiffs are entitled to reimbursement

only if the District offered Caitlin an IEP that was inappropriate.  *See Ridgewood*, 172 F.3d at

248 (noting that the court "may award a disabled student the cost of [a] private placement if . . .

the court determines [that] the student's IEP is inappropriate").

### A.     Appropriateness of the IEP

Whether an IEP is appropriate is a question of fact.  *S.H.*, 336 F.3d at 271 (*citing Carlisle*,

62 F.3d at 526).  In this case, the District evaluated Caitlin, provided Plaintiffs with its evaluation

for their review, and then conducted an IEP meeting to create an IEP designed to provide Caitlin

with a FAPE.  (Doc. No. 20, Ex. A, at S-5 to S-9.)  The District invited Caitlin and her parents to

the IEP meeting.  Caitlin's parents attended the meeting and offered their thoughts and concerns.

(*Id.* at S-10, IEP.)  Caitlin's parents objected to the IEP and requested a due process hearing.  (*Id.*

at S-12.)  Although the District initially did not respond to the request, the District held a three-

day hearing after the parents' second request.  When the due process hearing did occur, the

Hearing Officer evaluated the IEP that the District created for Caitlin and determined that it

sufficiently met Caitlin's needs.  The Special Education Due Process Appeals Panel also

evaluated the IEP.  The Appeals Panel similarly determined that the IEP sufficiently met Caitlin's

needs.  We must defer to the Hearing Officer's findings and avoid imposing our own notions of

sound educational policy unless the nontestimonial record clearly indicates that the Hearing

Officer erred.  *See S.H.*, 336 F.3d at 270 (noting that a federal district court is "required to defer

to the [Hearing Officer's] factual findings unless it can point to contrary nontestimonial extrinsic

evidence on the record").  We will conduct a modified *de novo* review of the information

provided to the District at the time of the administrative review.  *See id.* (noting that under the

modified *de novo* standard of review, "a district court is required to make findings of fact based

on a preponderance of the evidence contained in the complete record, while giving some

deference to the fact findings of the administrative proceedings").

> 1.    *Review of Substantive Issues with the IEP*

Plaintiffs argue that the IEP was substantively insufficient inasmuch as Caitlin clearly

required a more controlled environment and specialized education than the IEP offered.

Plaintiffs also argue that the IEP lacked a plan for Caitlin to transition from a small private

school to a large public school and contained unacceptably low measures of learning and

measurable goals.[3]  (Doc. No. 20 at 10.)  In addition, Plaintiffs argue that the IEP lacked

specificity in addressing Caitlin's evaluation and in extending beyond the classroom.  (*Id.* at 11.)

The accommodations that Plaintiffs desired for Caitlin may well have conferred an

additional educational and emotional benefit to Caitlin.  However, the District is not obligated to

---

[3] In a letter rejecting the proposed IEP, Plaintiffs stated that the "IEP adequately addresses the ADHD component [of Caitlin's educational problems, but] inadequately addresses the emotion and behavioral component."  (Doc. No. 20, Ex. A, at S-12.)  They explained their belief that "an integrative approach to her curriculum will allow her to function at a level commensurate with her abilities.  We seek an approach that takes into account the integrative nature of her difficulties."  (*Id.*)  Plaintiffs stated that they had enrolled Caitlin in ASR at that time, believing that it was the most appropriate environment for her.  (*Id.*)

provide Caitlin with every conceivable accommodation for her disability.  *See Rowley*, 458 U.S. at 199 (finding that a FAPE does not require "the furnishing of every special service necessary to maximize each handicapped child's potential").  The District is obligated to provide Caitlin with an education specially designed to meet her unique needs such that she may benefit from it.  *S.H.*, 336 F.3d at 271; *see also Rowley*, 458 U.S. at 189 ("[W]hatever Congress meant by an 'appropriate' education, it is clear that it did not mean a potential-maximizing education."); *Hartmann v. Loudoun County Bd. of Ed.*, 118 F.3d 996, 1001 (4th Cir. 1997) ("States must . . . confer some educational benefit upon the handicapped child, but the Act does not require the furnishing of every special service necessary to maximize each handicapped child's potential.") (internal citations omitted); *Travis G.*, 544 F. Supp. 2d at 441 ("Generally speaking, a school district is required to show only that the proposed IEP would provide a meaningful education benefit and not that it would be the best possible education.").  The District met this obligation.

In developing the IEP, the District conducted a thorough evaluation of Caitlin and reviewed information from multiple sources.  The Hearing Officer noted that "at the time it offered Caitlin the IEP for the 2001-2002 school year, the District had, in addition to its evaluation data from testing, a specific set of information provided by the Parents, Caitlin's former school, Caitlin's therapist, Caitlin's psychiatrist, and Caitlin's school records."  (Doc. No. 20, Ex. C at 13.)  The Hearing Officer correctly observed that the District had never seen Caitlin in a school setting and thus intended to defer a final determination of certain features of the IEP until after the school year had begun and Caitlin could be observed in school.[4]  (*Id.*)

---

[4] The IEP contained a specially designed instruction:  "Complete a functional behavioral assessment and behavior plan for Caitlin within the first month of school."  (Doc. No. 20, Ex. A at S-10, IEP at 8.)

11

To support their rejection of the IEP, Plaintiffs offered evidence to the Hearing Officer concerning Caitlin's experiences and needs from the time that she was enrolled in ASR and KGS.  (Doc. No. 20, Ex. C, Findings of Fact ¶¶ 42-75.)  However, on the basis of the witness testimony from ASR and KGS, the Hearing Officer found that "either Caitlin significantly changed after the District evaluated her, or that relevant aspects of Caitlin's personality were withheld from the District or unavailable to even those who knew her well at the time of the District's evaluation."  (Doc. No. 20, Ex. C at 14.)  The Hearing Officer found, and we agree, that "[w]hatever the reason for the change, the District was only responsible for programming for Caitlin as she was at the time of her evaluation."  (*Id.*)

Caitlin's parents argue that the IEP did not provide enough "individualized tutoring and mentoring; [and] special learning needs support."  (Doc. No. 20, Ex. A at S-12).  They also argue that Caitlin would not receive sufficient weekly group and individualized therapy and a sufficient focus on the development of her social skills.  (*Id.*)  The Hearing Officer rejected these arguments, and we do also.  The Hearing Officer found that "Caitlin's IEP goals and objectives were appropriate to meet her needs, as they addressed improvement of study and organizational skills, and use of strategies to manage her school and social behaviors."  (*Id.*)  Indeed, the IEP contained "[s]pecially designed instruction for organizational and study skills . . . to be implemented by regular education teachers in consultation with the special education (emotional support) teacher/case manager who was also available to assist Caitlin."  (Doc. No. 20, Ex. C at 14.)  The IEP further addressed Caitlin's behavioral and social needs through "one or more periods weekly in an emotional support resource room staffed by a special education emotional support teacher/case manager as well as by a part time mental health professional."  (*Id.*)

12

The IEP was appropriate in other respects.  It provided for an evaluation of Caitlin in her first month of school to determine whether additional therapy or emotional support would be necessary.  (*Id.*)  It identified the following goals:  "Caitlin will improve her study and organizational skills to a competency level by using specific learning strategies . . . and, Caitlin will use strategies to manage her school and social behaviors to a mastery level."  (Doc. No. 20, Ex. C ¶ 32.)  It also offered Caitlin "a daily check-in with the emotional support teacher/case manager" as well as "one 45-minute weekly session of mental health counseling at school through Child Guidance Resources."  (*Id.*)  The Hearing Officer considered Caitlin's needs and found this to be an appropriate place to start given that "Caitlin had never been enrolled in the District, or indeed in any public school."  (*Id.*)  Moreover, the Hearing Officer found that the "District's evaluation, with which the Parents agreed and which was not contradicted or supplemented by outside evaluations, did not support the need for residential placement, which was entirely too restrictive a setting and bore no connection with Caitlin's educational need as they presented at the time of the evaluation."  (*Id.*)  We agree that all of these aspects of the IEP were appropriate.

Finally, the Hearing Officer determined that a number of Plaintiffs' concerns fell outside the ambit of the District's responsibility.  For example, the Hearing Officer determined that "it was reasonable to believe that medication management would continue to be done by a private psychiatrist and that any additional individual or family therapy that Caitlin needed for her mental health needs (in contrast to her educational needs) would be procured by [Caitlin's] Parents."  (*Id.* at 14-15.)  The Hearing Officer noted that "psychotropic medication management and family therapy are clearly not the responsibility of the District, and were properly the

13

continued responsibility of the parents." (*Id.* at 15.)  We agree.  *See* 20 U.S.C. § 1401(26) (outlining "related services"[5] that can be provided to a disabled child to the extent that those services will assist the child to benefit from special education).

The law is clear that "the purpose of [the IDEA is] 'more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside.'" *M.C. ex. rel Mrs. C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 62 (2d Cir. 2000) (*quoting Rowley*, 458 U.S. at 192).  The IEP prepared for Caitlin accomplishes this. The Hearing Officer correctly emphasized that "[a]lthough the Parents believed that the Academy at Swift River was 'the most appropriate environment' to meet Caitlin's needs, the standard is appropriate, not most appropriate." (Doc. No. 20, Ex. C at 15.)  The Hearing Officer properly concluded that the IEP was "procedurally and substantively appropriate and designed to provide Caitlin with FAPE." (*Id.*)  Based on the record and the evaluation available to the District's IEP team, we find no substantive flaws in the IEP.

---

[5] Those related services include:

> transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including rehabilitation counseling, orientation and mobility services, and *medical services, except that such medical services shall be for diagnostic and evaluation purposes only*) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.

20 U.S.C. § 1401(26) (emphasis added).

2.       *Review of Procedural Issues with the IEP*

Plaintiffs argue that procedural errors in the IEP process resulted in an inappropriate IEP. Specifically, Plaintiffs point to the District's failure to provide a timely due process hearing and the District's failure to hear from certain witnesses. It is true that the IEP procedure is designed to ensure the creation of appropriate IEPs, and that procedural errors can result in an inappropriate IEP. "However, it does not follow that every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 381 (2d Cir. 2003) (discussing delays in the development and review of IEPs). "Only if we find that a procedural violation has resulted in such substantive harm, and thus constituted a denial of the child's right to a FAPE . . . may we 'grant such relief as the court determines is appropriate.'" *Kings Local Sch. Dist. Bd. of Educ. v. Zalanzy*, 325 F.3d 724, 732 (6th Cir. 2003) (*citing Knable*, 238 F.3d at 764); *see also C.M.*, 128 Fed. App'x at 881 ("Only those procedural violations of the IDEA which result in loss of educational opportunity or seriously deprive parents of their participation rights are actionable."); *Manheim*, 540 F. Supp. 2d at 616 (noting that a child is denied a FAPE "only when a procedural violation of the IDEA results in the loss of educational opportunity or seriously infringes the parents' opportunity to participate in the IEP formation process") (internal alteration and citation omitted).

The *Grim* case is instructive. *See* 346 F.3d at 381. In *Grim*, the parents of a learning-disabled child determined that the school district's IEP was insufficient to meet their child's needs. *Id.* at 382. There was an "extensive delay" in the school district's development and review of the IEP. *Id.* at 381. Meanwhile, the parents enrolled their child in a private school. The court concluded that the IEPs were adequate to confer an educational benefit, even though

the parents did not avail themselves of the programs.  *Id.*  "Because the programs were both

appropriate and available, any delay in resolving the parents' challenges to them cannot have

prejudiced [the child's] education."  *Id.*  The absence of prejudice was "particularly clear"

because the parents had removed the child from the district and placed her in a private school

"months before they challenged the IEP for that year."  *Id.* at 382.  The court found "no

suggestion in the record that the [parents] would have altered their placement decision had their

challenges to the IEPs been resolved in a more timely fashion."  *Id.*

  Plaintiffs argue that the District invited no one from Agnes Irwin to the hearing in

contravention of the IDEA.  (Doc No. 20 at 9.)  Plaintiffs also argue that Caitlin's psychologist,

Dr. Jennifer Jackson-Holden, was not invited even though her input would have been beneficial.

(*Id.* at 10.)  The Hearing Officer did not address these issues.  While there is no requirement that

the District invite Caitlin's psychologist to the IEP meeting, a representative from Agnes Irwin

should have been present.  *See S.H.*, 336 F.3d at 270 ("The IEP team is to be composed of the

child's parents, at least one special education teacher of the child, a specialist in developing

curriculum from the local district, and at the request of the parent or school district, anyone with

special knowledge or expertise related to the child's education." (*citing* 20 U.S.C.

§ 1414(d)(1)(B); 34 C.F.R. §§ 300.340 to 300.350)).  We are satisfied, however, that in this case

the absence of a representative from the Agnes School did not violate Caitlin's right to a FAPE.

  There is no evidence that the presence of an Agnes Irwin representative would have

altered Caitlin's subsequent placement at ASR.  Plaintiff began her schooling at ASR on August

27, 2001, several days before the IEP meeting with the District.  The District's evaluation did

include input from Agnes Irwin.  (*See* Doc No. 20, Ex. A, at S-7, CER at 2).  Plaintiffs were

given a chance to review the District's evaluation and did not object.  Further, Plaintiffs were given the opportunity to invite whomever they wished to the meeting and did not invite anyone from Agnes Irwin or Dr. Jackson-Holden.  (Doc. No. 20, Ex. A at S-7, Cover Letter.)

Plaintiffs also point to delays in the creation of the IEP and in the scheduling of a due process hearing to evaluate the proposed IEP.  (Doc No. 20 at 10.)  There is no question that Plaintiffs suffered a delay when they requested a due process hearing on September 10, 2001. Plaintiffs requested the hearing a second time in November 2002, and the District ultimately held the hearing in February 2003.  In evaluating the impact of this delay, the Hearing Officer observed:

> [a]though this is a clear procedural error, which would weigh heavily against its favor if a balancing of the equities were necessary, it did not result in denial of educational benefit to Caitlin because she had already been enrolled in a parentally-chosen unilateral placement that the Parents deemed appropriate and a due process hearing would have resulted in finding that the IEP offered to Caitlin by the District was appropriate.

(Doc No. 20, Ex. C at 19.)  These circumstances, similar to those in *Grim*, did not result in a denial of a FAPE to Caitlin.  There is also no evidence or even likelihood the outcome would have been different had the hearing been held promptly, as Caitlin was already enrolled at ASR and presumably her tuition had already been paid.[6]  We are satisfied that procedural errors in the IEP process did not result in an inappropriate IEP.[7]

---

[6] Parents who "unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk."  *Florence*, 510 U.S. at 15 (*citing Sch. Comm. of Burlington, Mass. v. Dep't of Educ.*, 471 U.S. 359, 373-74 (1985)).

[7] We previously addressed the delay issue in this matter upon a Motion for Limited Judgment on the Pleadings.  (Doc. No. 14.)  Plaintiffs requested tuition reimbursement on the grounds that the District did not grant them a due process hearing for over a year after they

In addition, Plaintiffs claim that Caitlin was denied a FAPE for the 2002-2003 school year because the District did not reevaluate her.  (*See* Doc No. 20 at 13.)  The IDEA requires that IEPs be reviewed "periodically, but not less than annually to determine whether the annual goals for the child are being achieved; and revise[d] . . . as appropriate."  20 U.S.C. § 1414(d)(4)(A)(i)-(ii).  "The federal courts have said little on the failure to revise programs, but the school district is required to revise the programs as appropriate."  *Kings Local Sch. Dist., Bd. of Educ. v. Zelazny*, 325 F.3d 724, 731 (6th Cir. 2003).  "[P]rocedural violations that deprive an eligible student of an individualized education program or result in the loss of educational opportunity . . . will constitute a denial of a FAPE under the IDEA."  *Knable*, 238 F.3d. at 766.  The District did not reevaluate Caitlin for the 2003-2003 school year.  However, the Hearing Officer found that "absent a reevaluation, the August 2001 IEP remained appropriate for 2002-2003."  (Doc. No. 20, Ex. C at 21.)  There is no evidence that Caitlin was deprived of an IEP, as there was already an IEP in place which had not yet been utilized for her.  There is no evidence that Caitlin suffered the loss of any educational opportunity.  We therefore agree with the Hearing Officer that the failure to revise Caitlin's IEP is not a fatal error under the IDEA.  *See Gray v. O'Rourke*, 48 Fed. App'x 899, 901-02 (4th Cir.  2002) (unpublished opinion) (holding that school district's failure to respond in writing to parents' request for revised IEP did not violate right to a FAPE, since parents unilaterally placed daughter at a private school and the district's failure to review the IEP did not result in any loss of educational opportunity); *Me. Sch. Admin. Dist. No. 56 v. Ms.*

---

requested it.  (*Id.* at 6.)  We concluded that despite the error on the part of the District in delaying the hearing, "reimbursement is a proper remedy *only* where the proposed IEP was inappropriate and the private school placement was proper under the Act."  (Doc. No. 14 at 7 (emphasis added).)  As discussed above, the proposed IEP was not inappropriate.

*W.*, No. 06-81-B-W, 2007 WL 922252, at *8 (D. Me. Mar. 27, 2007) (holding that delay in

providing services "was appropriately faulted," but the delay "simply did not independently lead

to a denial of educational benefit or a [FAPE]").

We must give due weight to the factual findings of the administrative officer, where

available, unless we can point to contrary nontestimonial extrinsic evidence on the record.  *S.H.*,

336 F.3d at 270.  We cannot substitute our own notions of sound educational policy for those of

the District.  *Id.* at 271.  For the reasons discussed above, we agree with the findings of the

Hearing Officer.  We are satisfied that the IEP was reasonably calculated to provide a meaningful

educational benefit to Caitlin.  The IEP offered to Caitlin was appropriate and, therefore,

Plaintiffs' request for tuition reimbursement for ASR and KGS must be denied.[8]

### B.    Compensatory Education

Under the IDEA, a disabled student is entitled to a FAPE until age 21.  *Lauren W. ex rel.*

*Jean W. v. Deflaminis*, 480 F.3d 259, 272 (3d Cir. 2007) (*citing* 20 U.S.C. § 1412(a)(1)(A)).  "An

award of compensatory education allows a disabled student to continue beyond age twenty-one in

order to make up for the earlier deprivation of [a FAPE]."  *Ridgewood*, 172 F.3d at 249.  "The

right to compensatory education accrues when the school knows or should know that the student

is receiving an inappropriate education."  *Id.* at 250.  An inappropriate education under the IDEA

is a program which is does not provide "significant learning" and confer a "meaningful benefit."

*Id.* at 247.

---

[8] Because we are satisfied that the District's IEP was sufficient, we need not reach the
issue of the appropriateness of Caitlin's private school placements.  Nevertheless, we note that
we find no basis upon which to disagree with the Hearing Officer's conclusion that neither
school was appropriate for Caitlin.

In this case, we have concluded that Caitlin was not denied a FAPE.  A grant of compensatory education is not appropriate and Plaintiffs' request for compensatory education must be denied.

**C.     Violation of Section 504 of the Rehabilitation Act of 1973**

The Rehabilitation Act of 1973, 29 U.S.C. §§ 701, *et seq.*, and section 504 of the Act, 29 U.S.C § 794, prohibit discrimination on the basis of disability in schools that receive federal funding.  In order to establish a violation of § 504 of the Rehabilitation Act, a plaintiff must prove that "(1) he is 'disabled' as defined by the Act; (2) he is 'otherwise qualified' to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school."  *Ridgewood*, 172 F.3d at 253 (*citing W.B. v. Matula*, 67 F.3d 484, 492 (3d Cir. 1995)), *abrogated on other grounds by A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 803-06 (3d Cir. 2007).  The plaintiff must demonstrate that the defendant knew or should reasonably have been expected to know of her disability but need not prove that the discrimination was intentional.  *Ridgewood*, 172 F.3d at 253.  The Third Circuit has determined that "there are few differences, if any, between IDEA's affirmative duty and section 504's negative prohibition and have noted that the regulations implementing section 504 require that school districts 'provide a free appropriate education to each qualified handicapped person in [its] jurisdiction.'"  *W.B.*, 67 F.3d at 492-93.

Plaintiffs have failed to demonstrate any genuine issue of fact to show that they have a claim under section 504.  Plaintiffs have presented no evidence that Caitlin "was excluded from participation in, denied the benefits of, or subject to discrimination" in the District.  *Christen G.*

20

*by Louise G. v. Lower Merion Sch. Dist.*, 919 F. Supp. 793, 821 (E.D. Pa. 1996). Furthermore, as the IDEA and section 504 are very similar and result in similar available relief, and since we have determined that there was no violation of the IDEA in this matter, no further remedy under section 504 is necessary or appropriate. Summary judgment in favor of Defendant must be granted on Plaintiffs' section 504 claims.

### D.    Claims under 42 U.S.C § 1983

Plaintiffs predicate their § 1983 claims upon violation of rights secured by the IDEA and section 504 of the Rehabilitation Act.[9]  (*See* Doc. No. 24 at 23.)  We have concluded that Plaintiffs' rights under the IDEA and the Rehabilitation Act have not been violated. Accordingly, there is no basis for a claim under 42 U.S.C. § 1983.  *See, e.g.*, *Falzett v. Pococo Mountain Sch. Dist.*, 152 Fed. App'x 117, 120 (3d Cir. 2005) (affirming grant of summary judgment in favor of the defendant on § 1983 claim "because [the district] provided [the plaintiff] with a FAPE").  Summary judgment must be granted in favor of Defendant on these claims.

---

[9] Plaintiffs cite *Matula* in support of their § 1983 claim.  *See* 67 F.3d at 494.  The Third Circuit recently held in *A.W.* that because both the IDEA and the Rehabilitation Act have sufficiently comprehensive remedial schemes, § 1983 is not available to remedy violations of the rights created by those statutes.  *See A.W.*, 486 F.3d at 803 ("Congress did not intend § 1983 to enforce the predicate rights secured by the IDEA . . . ."); *id.* at 806 ("[W]e conclude that § 1983 is not available to provide a remedy for defendants' alleged violations of [the plaintiff's] rights under § 504.").  In so holding, the Third Circuit abrogated the holding in *Matula* on which Plaintiffs rely.  *See, e.g.*, *Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, No. 05-2535, 2007 WL 4225584, at *6 (E.D. Pa. Nov. 29, 2007) (recognizing that *A.W.* holds "plaintiffs may not bring actions pursuant to 42 U.S.C. § 1983 to enforce the predicate rights secured by IDEA and section 504").  Even assuming that the rationale of *Matula* applied to this case, there is still no genuine issue of material fact and summary judgment must be granted in favor of Defendant on the claim.

**E.      Attorney's Fees**

The IDEA provides when and to what extent a court may award attorney's fees.  20 U.S.C § 1415(i)(3)(B)(i).  Based upon our decision in this matter and the guidelines set forth in § 1415(i)(3)(B)(i), no award of attorney's fees is appropriate.

**IV.    CONCLUSION**

We are satisfied that the IEP provided to Caitlin was appropriate.  The District offered Caitlin a FAPE, and the equities do not call for reimbursement of Caitlin's private school tuition. Since there is no genuine issue of material fact to adjudicate in this matter, summary judgment must be granted in favor of Defendant.

An appropriate Order will follow.

BY THE COURT:

_____

R. Barclay Surrick, J.